In the Matter of NEW YORK STATE GUERNSEY BREEDERS CO-OPERA-TIVE, INC., Petitioner, Respondent, against HOLTON V. NOYES, as Commissioner of Agriculture and Markets of the State of New York, Respondent, Appellant.

Third Department, June 30, 1943.

*Irving G. Hubbs* and *Merritt A. Switzer* for petitioner, respondent.

*Milo R. Kniffen,* Counsel to the Department of Agriculture and Markets (*Robert G. Blabey* of counsel), for respondent, appellant.

*Harry D. Suitor, Hampton H. Halsey* and *Francis L. McElroy* (*Robert Lamont* of counsel), for Niagara Frontier Co-operative Milk Producers Bargaining Agency, Inc., and others, *amici curiae.*

*Per Curiam.* In this proceeding it is the petitioner's contention that the Commissioner erred in failing to make an appropriate differential for petitioner's Guernsey milk. The previous history of the Buffalo proceeding is reported at 260 Appellate Division 240, modified and remitted 284 New York 197, and that of the Rochester order is reported at 260 Appellate Division 139, modified and remitted 285 New York 523. Upon the rehearings ordered by the Court of Appeals the proceedings were consolidated and are now treated as one.

After the above decisions of the Court of Appeals and remittiturs of that court, orders were made at Special Term by which the matter of determining " a differential in favor of petitioner's milk sold as Guernsey milk " was remitted to the respondent commissioner " solely in respect thereto with instructions to make the necessary findings of fact " and " with instructions to make any necessary adjustment of petitioner's obligations and benefits under the equalization provisions in the order in accordance with whatever determination the Commissioner may make." Nevertheless the notice of hearing and the hearing itself were not limited to the matters thus directed to be determined and the Commissioner proceeded to hear and determine the relative merits of Guernsey and other milks, generally. He did not determine the special facts relative to petitioner's Guernsey milk, its cost of production, marketability and quality, but found that he was unable to draw any definite conclusions concerning the relative cost of producing milk by the use of cattle of different breeds, although the record is replete with

evidence on this subject. He did make a finding, however, that other things being equal, it cost more to produce a given weight of Guernsey milk containing four and five-tenths per cent of fat than it does to produce an equal weight of milk containing three and five-tenths per cent fat by the use of cows of some other breeds. The evidence would also have sustained a further finding, although none was made, that the butterfat differential was inadequate to cover this increased cost. The Commissioner also professed to be unable to compare the market price received for Guernsey and other milks although there was much evidence bearing thereon. Finally he states that producers and marketers of Guernsey milk are not restrained either by law or the orders in question from selling their milk for a premium price and retaining such premium. This last conclusion was negatived by the admission upon the argument that this privilege was of little or no value because of the present maximum prices which are now in effect under Federal price regulations.

Upon the previous appeal the Court of Appeals declared the power of the Commissioner to grant a differential where it was shown that there existed a distinct difference in production costs, quality or marketability of milk of one breed of cows from that of other breeds (284 N. Y. 197). Nevertheless in spite of this holding and the finding that it did cost more to produce Guernsey milk, the Commissioner refused to grant such differential. The great weight of the evidence here sustains petitioner's contention that it cost more to produce its Guernsey milk, that in most respects such milk was superior to the average milk produced under these orders and that it possessed greater marketability.

The determination does not comply with the directions of the Court of Appeals. Also many of the facts established by the petitioner were not found and many of the findings which were made are so preponderantly contrary to the weight of the evidence that a jury's verdict affirming the existence thereof in an action in the Supreme Court would have to be set aside as against the weight of the evidence.

CRAPSER, J. (dissenting). This is a proceeding instituted by the New York State Guernsey Breeders Co-operative, Inc., pursuant to article 78 of the Civil Practice Act, to review the determination by the Commissioner of Agriculture and Markets denying petitioner, a co-operative corporation, a differential under Final Orders Nos. 127 and 129, known as the Buffalo and Rochester Milk Marketing Orders in favor of petitioner's milk sold as Guernsey milk. The Commissioner on the return

of a motion at Special Term made a cross-motion to require petitioner to pay over the moneys at issue and he appeals from the denial of such cross-motion.

The only issue is whether the record supports the Commissioner's refusal to grant the Guernsey Breeders' claim that the milk handled for sale should be allowed a differential out of the pool.

On July 25, 1938, The Niagara Frontier Co-operative Milk Producers Bargaining Agency, Inc., petitioned the Commissioner of Agriculture & Markets for a public hearing upon the proposed milk marketing order. In accordance with the provisions of the statute a hearing was held and the Commissioner made an order known as Order No. 127.

At the hearing before the Commissioner the petitioner was represented and presented evidence upon which it based a request for a differential on the Guernsey milk which it handled or that such milk be not included under the equalization provisions of the order. Its request was denied. It thereupon instituted a proceeding at Special Term under article 78 of the Civil Practice Act to review the determination of the Commissioner. That proceeding was transferred to the Appellate Division, Third Department, which affirmed by a divided court. The opinions are reported in 260 Appellate Division 240. The petitioner then appealed to the Court of Appeals which said: " The absence of adequate findings of fact in respect to the uncontroverted evidence introduced at the hearing upon the proposed order by petitioner compels us to reverse the order of the Appellate Division and the order of the Commissioner of Agriculture in so far as they deny a differential in favor of milk sold as Guernsey milk, and to remit the matter to the Commissioner solely in respect thereto with instructions to make the necessary findings of fact, either upon the evidence introduced or upon the evidence that may be introduced upon another hearing, if the Commissioner deems one desirable, with leave to any party appearing, if another hearing is had, to introduce new evidence; and with instructions to make any necessary adjustment of petitioner's obligations and benefits under the equalization provision in the order in accordance with whatever determination the Commissioner may make; otherwise, the orders should be affirmed, * * *."

The opinion in the Court of Appeals case is reported at 284 New York 197 and the above quotation is from page 205 of said opinion.

The Commissioner in a similar proceeding for the Rochester District made a similar order, being Official Order 129. The petitioner instituted a proceeding under article 78 of the Civil Practice Act, which was transferred to the Appellate Division, Fourth Department, where the order of the Commissioner was unanimously affirmed, 260 Appellate Division 139. The petitioner in that proceeding appealed to the Court of Appeals and a similar decision was rendered by the Court of Appeals as in connection with Order No. 127. The decision of the Court of Appeals is found at 285 New York 522. Subsequently hearings were held by the Commissioner pursuant to the decision of the Court of Appeals.

The hearings in the Buffalo and Rochester districts were consolidated and the appeal now pending in this court is from the order made at such consolidated hearing which denied petitioner's claim for a differential on the Guernsey milk which it handles.

The remission of the matter of the differential did not determine petitioner's right to it. The reason for the remission is plainly stated in the opinion by the Court of Appeals (284 N. Y. 203, 204) to be the Commissioner's failure to make findings on petitioner's claim which constituted a determination by omission " that such a difference does not exist or that it is immaterial." Thus, the determination became judicial rather than administrative. Factual findings have now been made.

At the new hearings scheduled by the Commissioner upon Orders Nos. 127 and 129, covering the Buffalo and Rochester Districts, 1231 pages of testimony were taken and 31 exhibits were received which are set forth by the Commissioner after the hearings and consideration of all the evidence in the case.

It appears from the record that the New York State Guernsey Breeders Co-operative, Inc., has 450 members, as stated in the petition, residing throughout the whole of New York State. Out of this number 31 members are in the Buffalo area and 42 in the Rochester district.

There is evidence in the record that the petitioner is interested in advancing the Guernsey breed of cattle and that its milk business is only incidental to that purpose. The membership of the petitioner is made up of farmers who enter into contracts to sell their milk through the petitioner and who are known as " Pool Members." Some dealers who have their own markets pay for the privilege of using the Guernsey trademark, and are known as " Producer-Dealer Members." Some members are paid members. A member does not necessarily

market·his milk through the association. He may sell through some other outlet and even milk sold through the association is not always identified as "Golden Guernsey." When sold as "Golden Guernsey" a premium of two cents in Buffalo and one cent in Rochester was charged per quart over and above the regular market price.

Although the members are supposed to have herds of the Guernsey breed, it does not mean that the animals are all registered stock. The herd animals can be grade stock and need only have Guernsey characteristics. Milk from grade animals goes into the same tank as the milk from pure breds and is sold under the Golden Guernsey label. Many Guernsey producers are members of other associations such as the Dairymen's League. A Guernsey cow is fawn and white in markings. Some may be all fawn. Others may be more or less white. Usually the circles around their eyes are buff or flesh colored. In general that is what a Guernsey was said to look like and both pure bred and grade animals have the same markings. As for butter fat, that is determined from a composite of the herd and not of its individuals. Grade Guernsey's may have Holstein blood in them.

The petitioner in addition to milk received from its members buys Holstein milk which it sells under the designation "Grade A." Guernsey breeders put on the Syracuse market a "Baby Milk" which is advertised by it as milk from pure bred Holstein cows. This was done to acquire trade because the petitioner found that the "commercial competitive tendency of milk distributors to have a deep cream line on their bottle of milk has not been pleasing to the medical and nursing profession as a 'Baby Milk'."

The findings of the Commissioner are very full and complete. He finds that the herds of dairy cows in the State are divided into the following general classes: (a) Those composed entirely of registered pure breds. (b) Those composed partly of registered pure breds and partly of grades of the same breed. (c) Those composed of herds of a single breed. (d) Mixed herds composed of animals of different breeds or of no particular breed.

In 1930 there were approximately 155,626 pure bred cattle of the four major dairy breeds, to wit: Holstein, Guernsey, Jersey and Ayrshire in the State of New York and the number of each breed was as follows: Jersey, 13,799; Ayrshire, 14,881; Guernsey, 19,390; and Holstein-Friesian, 106,311. Thus it is seen that the total number of pure bred animals in the State

of New York constitutes a small percentage of the total number of dairy cattle in the State.

The Commissioner has found that the cattle of each distinctive breed have points of merit and peculiar advantages, no breed having a monopoly of points of merit.

He has found that cows' milk is not uniform in composition. The composition of milk of the four leading dairy breeds is as follows:

Average Composition of Milk of Various Breeds (From *Feeds & Feeding*) (C 602).

| Breed | Fat Per Cent | Protein Per Cent | Lactose Per Cent | Mineral Matter Per Cent | Solids Per Cent | Total Per Cent |
|---|---|---|---|---|---|---|
| Ayrshire ....... | 3.97 | 3.51 | 4.81 | 0.68 | 9.00 | 12.97 |
| Guernsey ...... | 4.91 | 3.90 | 4.97 | 0.74 | 9.61 | 14.52 |
| Holstein-Friesian | 3.42 | 3.30 | 4.89 | 0.68 | 8.87 | 12.29 |
| Jersey ......... | 5.29 | 3.79 | 5.00 | 0.70 | 9.49 | 14.78 |

He has found that cows' milk varies more widely in fat content than in any other constituent and that milk produced by individual cows of the same breed may vary widely in fat content as well as in quantity and color. He has found that the weighted average fat content of samples of mothers' milk is three and thirty-five one hundredths per cent and the weighted average total solids content of samples of mothers' milk is twelve and fifty-two one hundredths per cent. Holstein cows produce more milk and more pounds of fat than do Guernsey cows but the percentage of fat in Guernsey milk is greater than the percentage of fat in Holstein milk.

His findings cover the amount of milk produced as shown by the Dairy Herd Improvement Association records for 1939 and he has made findings as to the amount of milk and cost of the Holstein herd and the Guernsey herd at Cornell University. His findings cover herds of different owners and of different breeds of cattle and their production records.

He finds that the petitioner was incorporated in 1932 and took over the activities previously handled by the New York State Guernsey Breeders' Association, Inc., without any change in management or policies.

His findings cover the history of Guernsey cattle in the State of New York pretty fully. He has found that Guernsey milk and other kinds of milk are substituted for each other with relative ease and that Guernsey milk and other kinds of milk are sold in competition with each other.

It would not be safe on the basis of the testimony to draw any definite conclusions concerning the relative cost of producing milk by the use of cattle of different breeds. In the case of the Cornell University herds, it is clear that the Holstein herd exceeds the average Holstein herd in performance to a greater extent than the Guernsey herd exceeds the performance of average Guernsey herds. There is no evidence showing costs of producing milk by the use of comparable cows of different breeds under strictly comparable conditions. It is conceded, however, that other things being equal, it does cost more to produce a given weight of Guernsey milk containing four and five-tenths per cent of fat than it does to produce an equal weight of milk containing three and five-tenths per cent fat by the use of cows of some of the other breeds.

On the basis of the testimony, little weight can be given to any attempted comparison of the amount by which the price received for milk produced by one breed of cows exceeds the price received for milk produced by another breed; or of the net amount remaining from the sale of milk produced by different breeds of cows after deducting the cost of producing it.

The cost of producing milk is influenced by many factors such as relative productivity of the dairy farm, the geographical location of the farm, the nearness to market, the facilities on the farm, the availability and the character of the feed, the health of the herd, the inherent capacity of the herd and the skill of the herdsman. The price received for milk would be influenced by the geographical location of the market where sold, the distance from the farm to the market, the nature of the market such as wholesale or direct sales by the producer, either at the farm or on a route.

It would not be safe to conclude either that milk of a relatively high fat content had better flavor than milk of a relatively low fat content, or that the reverse were true. Dr. Garrett's testimony supported the theory that high fat content milk excelled other milk in flavor. Other experimenters held the opposite view. The Garrett experiments were not surrounded with adequate safeguards. They were partially financed by the American Guernsey Cattle Club, and the suggestions of the latter were taken in connection with the experiments.

The Commissioner has made the following conclusions: " 1. Producers and marketers of Guernsey milk are not restrained either by law or by either Official Order No. 127 or 129 from selling their milk at a premium price over and above the mini-

mum price fixed by these official orders, and are not restrained from retaining that premium for themselves. They are free to negotiate with dealers purchasing their milk for a special premium. Any such special premium which milk sold as Guernsey milk can command in the market should be paid by the dealers and should not be included in the computation of the uniform price.

" 2. There is no justification for including in either Official Order No. 127 or 129 a differential in favor of milk sold as Guernsey milk, and no adjustment in favor of milk sold as Guernsey milk should be made under the equalization provisions of such Official Orders Nos. 127 and 129."

The Commissioner's findings support his conclusions and there is ample evidence in the record to support the findings made by the Commissioner.

Under the circumstances this court has no authority to substitute its judgment for the judgment of the Commissioner charged by the Legislature with the responsibility. (*Matter of Dusinberre* v. *Noyes*, 284 N. Y. 304, 308.)

The Commissioner's determination should be affirmed, with fifty dollars costs and disbursements.

HILL, P. J., BLISS and HEFFERNAN, JJ., concur in *Per Curiam* opinion; CRAPSER, J., dissents and votes to confirm in an opinion, in which SCHENCK, J., concurs.

Determination annulled upon the law and facts, with fifty dollars costs and disbursements, and matter remitted.

Order appealed from affirmed, without costs. All concur.